# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

TODD EVANS,

     Plaintiff

v.

JAMES DZURENDA, et al.,

     Defendants

Case No.: 3:18-cv-00283-RCJ-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 122

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' motion for summary judgment. (ECF Nos. 122, 122-1 to 122-8, 124-1 to 124-12, 128-1.) Plaintiff filed a response. (ECF No. 136, 136-1 to 136-9.) Defendants filed a reply. (ECF No. 139.)

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding with this action pursuant to 42 U.S.C. § 1983. (ECF No. 60.) Plaintiff had counsel when he filed his amended complaint, but counsel subsequently withdrew due to a conflict, and Plaintiff is now proceeding pro se. (ECF Nos. 61, 62.)

The court screened Plaintiff's amended complaint and allowed him to proceed with claims under the Eighth Amendment for alleged deliberate indifference to serious medical needs related to chronic hepatitis C virus (HCV) and a pituitary tumor. (ECF No. 65.)

1    Plaintiff alleges that he entered NDOC custody in 1995 and in 2010, he began

2  experiencing severe medical symptoms and was diagnosed with HCV. He avers that direct-

3  acting antiviral (DAA) treatment is the standard of care for chronic HCV, however, it has been

4  NDOC's policy and practice to deny DAA treatment to all but a select few inmates. He alleges

5  that NDOC's Medical Directive (MD) 219 contains NDOC's policy for treatment of HCV. He

6  asserts that the version of MD 219 enacted on May 17, 2017, excluded many HCV patients from

7  treatment based on APRI[1] scores or symptoms even though there was no medical justification for

8  the exclusions from treatment. He avers that NDOC subsequently revised MD 219 to

9  acknowledge that patients with chronic HCV may benefit from treatment, but some patients

10  qualify for urgent treatment and NDOC assigned different priority levels for treatment. Plaintiff

11  claims there was no medical justification for delaying DAA treatment to anyone based on the

12  priority levels.

13    Plaintiff alleges that in April of 2017, he requested DAA treatment, but it was denied

14  based on MD 219. As a result of this denial, he has developed conditions associated with chronic

15  HCV, including type 2 diabetes and osteoarthritis. He further claims that without treatment, his

16  chronic HCV may progress, putting him at risk of cirrhosis, liver disease, pain and death.

17    With respect to HCV, Plaintiff was allowed to proceed with an Eighth Amendment claim

18  against defendants Dzurenda  (NDOC's former director) and Dr. Aranas (NDOC's former

19  medical director) based on allegations that they knew of Plaintiff's infection and that all patients

20  with chronic HCV would benefit from treatment, but they unreasonably enforced policies and

21

---

22  [1] APRI stands for aspartate aminotransferase to platelet ratio index, and is a way to measure the
amount of fibrosis, or scarring, in the liver. The APRI score is calculated by looking at the

23  amount of aspartate aminotransferase (AST), an enzyme created by the liver, and platelets, a type
of blood cell in the body. *See* What Is the APRI Score? (webmd.com), last visited April 20,
2023.

1  practices that denied Plaintiff treatment for his HCV, resulting in him continuing to suffer

2  damage and associated symptoms from the HCV.

3      Plaintiff was also allowed to proceed with an Eighth Amendment claim against Dr. Mar

4  and Dr. Johns based on allegations that they were aware a failure to treat Plaintiff's chronic HCV

5  would result in further significant injury to Plaintiff, but they nevertheless denied him treatment

6  for non-medical reasons.

7      Next, Plaintiff alleges that in 2017 he began experiencing pain in his head, neck and back

8  and shooting nerve pain in his hand, as well as difficulty managing his balance that resulted in

9  falls causing him injuries. In August of 2017, his symptoms worsened, and be had slurred

10  speech, headaches, numbness and paralysis in his left arm, auditory hallucinations and

11  intermittent issues with his vision. He claims that he was not referred for medical testing until

12  March of 2018, when he received MRIs of his spine which revealed a pituitary tumor in his

13  cervical spine. His symptoms began to worsen, but his tumor was not surgically removed until

14  April of 2019. Plaintiff alleges that the surgery was delayed due to cost associated with the

15  treatment, and as a result, he continues to experience severe symptoms.

16      Plaintiff was allowed to proceed with an Eighth Amendment claim against Dr. Mar and

17  Dr. Johns based on allegations that they knew of Plaintiff's pituitary tumor and associated

18  symptoms, but unnecessarily and unreasonably delayed treatment and surgery for the tumor,

19  resulting in prolonged and continued symptoms.

20      Defendants move for summary judgment, arguing: (1) Plaintiff's lab results show he does

21  not have active HCV; (2) the failure to immediately treat all inmates with DAA for HCV or a

22  prioritization of treatment for inmates with HCV does not violate the Eighth Amendment;

23

(3) Plaintiff received treatment relative to his cervical spine and pituitary tumor and there is no evidence his treatment was delayed due to cost; (4) Dr. Aranas did not treat Plaintiff; (5) Dzurenda is not a doctor and had no authority to order medical treatment; and (6) Defendants are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

*& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Eighth Amendment Deliberate Indifference Standard**

"The government has an 'obligation to provide medical care for those whom it is

punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th

Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical

care if he can prove that prison officials were deliberately indifferent to a serious medical need.

*Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two

elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other*

*grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698

F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further

significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at

1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with

deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

6

1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**B. Hepatitis C**

    **1. Background**

    Hepatitis is inflammation of the liver.[2] HCV is a blood-borne virus transmitted through exposure to infected blood. (ECF No. 60-2 at 2.) More than half of people who become infected with HCV will go on to develop a chronic infection.[3] Chronic HCV can lead to serious health problems. Some people have no symptoms, but others exhibit signs and symptoms.[4] Chronic HCV can result in liver fibrosis, or scarring of the liver, cirrhosis (severe fibrosis), liver failure or liver cancer.[5] DAA medications were approved in 2013 and cure chronic HCV in most cases.[6]

    A blood test that screens for HCV antibodies, if positive, means an individual was exposed to HCV at some point, but the virus may no longer be present in the blood if the body fought off the infection or the individual received treatment that cured the infection.[7] In the case of a positive antibody test, an HCV RNA test (a PRC test) should be given to show whether the individual has current active HCV and how much virus is in the blood.[8] If that test is positive,

---

[2] *See* What is Viral Hepatitis? | CDC, last visited April 19, 2023.

[3] *See* Hepatitis C Questions and Answers for Health Professionals | CDC, last visited April 19, 2023; Hepatitis C - NIDDK (nih.gov), last visited April 19, 2023.

[4] *See,* Hepatitis C - FAQs, Statistics, Data, & Guidelines | CDC, last visited April 19, 2023.

[5] Minev Decl., ECF No. 122-5 at 2 ¶ 4; Hepatitis C - NIDDK (nih.gov), last visited April 19, 2023.

[6] *See* Hepatitis C - NIDDK (nih.gov), last visited April 19, 2023.

[7] Once infected, an individual will always have HCV antibodies in their blood even if they have cleared the virus, have been cured or still have virus in the blood. *See* What to expect when getting tested for Hepatitis C | CDC, last visited April 19, 2023.

[8] *See* Hepatitis C - NIDDK (nih.gov), last visited April 19, 2023; What to expect when getting tested for Hepatitis C | CDC, last visited April 19, 2023.

1  the individual has the virus in his or her blood. *Id*. According to the CDC, only individuals with a

2  current infection, evidenced by a positive HCV RNA test, need treatment.[9]

3      **2. NDOC's HCV Policy—MD 219**

4      MD 219 contains NDOC's policies for treatment of HCV. Under the version of MD 219

5  effective in May of 2017 (and signed by Dr. Aranas), certain clinical indications were prioritized

6  for treatment: advanced hepatic fibrosis/cirrhosis; liver transplant recipients; hepatocellular

7  carcinoma (HCC); comorbid medical conditions associated with HCV; those taking an

8  immunosuppressant medication for a comorbid condition; and to provide continuity of care for

9  newly incarcerated inmates who were being treated at the time of incarceration. (ECF No. 60-1

10  at 4.) Inmates were excluded from treatment, among other reasons, if they had an APRI score of

11  less than 2.0, or a score of less than 1.5 if there were other findings suggestive of advanced

12  fibrosis/cirrhosis. (*Id*. at 5.)

13      Inmates who tested positive for HCV and displayed constitutional signs and symptoms

14  could be referred to a committee for evaluation and consideration for possible treatment. The

15  committee was made up of at least three senior members of the medical department, including

16  the medical director. The committee would convene periodically to review referrals. (*Id*.)

17      MD 219 was revised in November 2019 and January of 2020. (*See* ECF No. 122-2 at 6.)

18      The version of MD 219 effective in January of 2020 (signed by Medical Director Michael

19  Minev, M.D.), provided for HCV testing for all inmates on intake, unless they refused or opted

20  out of testing. (ECF No. 60-2 at 2.) Under this version of MD 219, all inmates who tested

21

22

23

---

[9] *See* Hepatitis C Questions and Answers for Health Professionals | CDC, last visited April 19, 2023.

1  positive for HCV were candidates for treatment, and had to be enrolled in the Infectious Disease

2  Chronic Clinic for Hepatitis C. (*Id*. at 3.)

3      The January 2020 version of MD 219 contains a priority criteria for HCV treatment based

4  on APRI scores, fibrosis stage, and other criteria. The directive acknowledges that all patients

5  with chronic HCV may benefit from treatment, but states that certain patients are at elevated risk

6  for disease progression and qualify for more urgent administration of treatment. (*Id*. at 5.)

7      This version of MD 219 noted that exceptions would be made to the priority level system

8  on an individual basis as determined by a compelling or urgent need for treatment, such as

9  evidence for rapid progression of fibrosis, or deteriorating health status from other comorbidities.

10  (*Id*.)

11      In 2019, various cases asserting violation of the Eighth Amendment against NDOC

12  employees due to alleged failure to treat HCV were consolidated into one case, 3:19-cv-00577-

13  MMD-CLB. A motion for class certification was granted in that case on February 18, 2020.

14  (ECF No. 21 in 3:19-cv-00577-MMD-CLB.) A settlement in that case led to the entry of a

15  consent decree. (ECF Nos. 79 and 80 in 3:19-cv-00577-MMD-CLB.)[10]

16      Under the consent decree, it was agreed that NDOC would adopt a revised version of MD

17  219. At that time, it was estimated there were fewer than 2,400 inmates within NDOC with

18  HCV. Within six months of approval of the consent decree by the Interim Finance Committee

19  (IFC) or Legislature, the defendants would provide DAA treatment to all inmates in priority level

20  one under the new MD 219 (as long as there is no medical contraindication). Within three years

21

22  [10] Defendants do not argue that Plaintiff's HCV claim is somehow barred by the settlement and
consent decree in 3:19-cv-00577-MMD-CLB, though Plaintiff's name does not appear on the list

23  of inmates who timely sought exclusion from consent decree. (*See* ECF No. 75 in 3:19-cv-
00577-MMD-CLB.) It is possible, as will be discussed further below, that this is because
Plaintiff does not have active HCV, and therefore, is not a member of the class.

of the effective date, the defendants would provide DAA treatment to a minimum of 2,400 class members on a rolling basis over the three years. After the completion of that timeline, the defendants agreed to provide DAA treatment to class members within NDOC custody at a rate that, at a minimum, exceeds the HCV infection rate of new inmates who test positive or are confirmed to be HCV positive during intake. For example, if an additional 600 inmates test positive for HCV during intake in one calendar year, they agree to provide DAA treatment to at least 600 class members in that year. (ECF No. 80 at 7-8 in 3:19-cv-00577-MMD-CLB.)

### 3. Analysis

Plaintiff alleges that he was diagnosed with HCV while incarcerated in NDOC in 2010, and then in 2017, he began experiencing severe medical symptoms, including rectal bleeding. He claims that he requested DAA treatment in April of 2017 at NNCC, and that requested was denied. As of the date of the filing of his amended complaint, December 7, 2020, he had not received DAA treatment for his chronic HCV. (ECF No. 60 at 10.)

There is a record from the Ohio Department of Rehabilitation and Correction dated March 10, 2000, indicating Plaintiff was HCV "reactive" on March 24, 1998. (ECF No. 136-2 at 23.) HCV testing was ordered for Plaintiff within NDOC on September 21, 2016. (ECF No. 136-1 at 1 ¶ 3; ECF No. 136-2 at 21.) An HCV antibody test on September 28, 2016, came back as reactive/abnormal, and a real time PCR test was recommended to determine the viral load/diagnosis of a current HCV infection. (ECF No. 136-2 at 3.) An HCV panel was ordered on October 6, 2016. (ECF No. 136-2 at 19.)

A record from LabCorp from a blood draw on December 14, 2016, states that the HCV quantitation was less than 5 copies/mL, and the report explains that a PCR assay was performed and results *greater than or equal to* 5 copies/mL of HCV RNA indicate the presence of virus-

specific nucleic acid sequence. (ECF No. 136-2 at 2.) This report appears to demonstrate Plaintiff did not have active HCV at that time.

Plaintiff sent a kite to a non-defendant doctor on March 2, 2017, asking for a liver biopsy and whether treatment was available. The response states: "Johns 3/15."[11] (ECF No. 136-2 at 65.)

On December 14, 2017, Plaintiff sent a kite to another non-defendant doctor, requesting that his liver enzyme levels be checked and for a liver ultrasound to check for cancer and cirrhosis, as well as treatment for HCV. (ECF No. 136-7 at 7.) Plaintiff sent another kite to a non-defendant doctor on December 30, 2019, asking to be signed up for HCV treatment. He was told in response that his APRI score was 0.50, and it needed to be 0.70 to 2.0 to move further with testing. (ECF No. 136-2 at 67.)

Plaintiff sent a kite to non-defendant doctor requesting HCV treatment on January 4, 2020. He was told that HCV was not detected. (ECF No. 136-7 at 6.) His lab results from February 25, 2020, also stated that HCV was not detected. (ECF No. 124-3 at 16.) His fibrosis score at that point was 0.18, indicating he was fibrosis stage F0, or no fibrosis. (ECF No. 124-3 at 9.)

Plaintiff sent kites to a non-defendant doctor on August 2 and 21, 2020, asking for treatment for HCV, and both times he was told that HCV was not detected. (ECF No. 122-1 at 2; ECF No. 136-7 at 29.) His lab results from May 21, 2021, found HCV was not detected, and explained this was consistent with a resolved past infection or a false positive HCV antibody. Repeat testing was to be considered after one month. (ECF No. 124-1 at 4.)

---

[11] There does not appear to be a record before the court that Plaintiff saw Dr. Johns on March 15, 2017.

Based on his January 2022 blood draw, Plaintiff's APRI score was 0.35. (Minev Decl., ECF No. 122-5 at 4 ¶ 17(b).)

While HCV can constitute a serious medical need, the medical evidence demonstrates that Plaintiff did not have active HCV during the time period he alleges he was denied DAA treatment, and as such, there was no need to provide him with DAA treatment.

Even if Plaintiff had active HCV, there is no evidence that Dr. Johns or Dr. Mar denied the requested treatment, as Plaintiff alleges. In addition, Dzurenda's declaration states that he was the director of NDOC, but he was not part of any committee that could have ordered treatment, and was not responsible for the formulation of medical directives, and had no authority to order treatment for HCV. (Dzurenda Decl., ECF No. 122-7 at 2 ¶¶ 3-10.) Plaintiff argues that Dzurenda was involved in policies related to HCV, but provides no *evidence* to support his assertion to create a genuine dispute of material fact as to Dzurenda's involvement.

Finally, the court notes that if Plaintiff were to contract HCV in the future, he should be provided DAA treatment under the consent decree.

In conclusion, summary judgment should be granted in Defendants' favor with respect to Plaintiff's first and second causes of action for violation of the Eighth Amendment due to the alleged denial of DAA treatment for HCV.

**C. Pituitary Tumor**

    **1. Plaintiff's Medical Records**

      Plaintiff sent medical request forms, known within the prison as "kites," in February, March and April of 2017 regarding pain in his neck, numbness, burning and tingling. He was prescribed Baclofen, and Dr. Mar referred him to neurosurgery. (ECF Nos. 136-3 at 14; 136-5 at 113; 136-7 at 14, 17, 19, 47.) Plaintiff had an x-ray of the cervical spine on April 5, 2017, which revealed advanced cervical spondylosis at C4-5 and C6-7. (ECF No. 124-5 at 2; ECF No. 136-5 at 4.) On April 10, 2017, Plaintiff asked for a consultation regarding an MRI for his neck and back. He was told that a request was submitted for an MRI of the cervical spine on April 3, 2017, and an appointment was scheduled for July 13, 2017. (ECF No. 137-7 at 45.) On April 12, 2017, it was noted Plaintiff had a pending MRI and "neuro" appointment. (ECF No. 124-4 at 12; ECF No. 136-5 at 112.)

      Plaintiff saw Dr. Leppla of Sierra Neurosurgery on May 2, 2017. Dr. Leppla recommended surgery on the lumbar spine. Dr. Leppla also indicated that once Plaintiff had an MRI of the cervical spine, they would be happy to see him for that issue as well. (ECF No. 136-5 at 21.)

      Plaintiff was seen at Sierra Neurosurgery again on June 7, 2017. It was noted he had an x-ray of the cervical spine, but not an MRI. (ECF No. 136-3 at 12.) A week later, Plaintiff sent a kite to Dr. Mar that he was having problems with his neck and back, where his arms would go numb. (ECF No. 136-7 at 41.) Dr. Johns requested a referral to Dr. Leppla at Sierra Neurosurgery on June 21, 2017, which was authorized on July 5, 2017. (ECF No. 136-3 at 16.)

On July 9, 2017, Plaintiff called a "man-down" due to neck stiffness, electrical shock pain, and claimed that he fell and hit his head in his cell. It was noted that he had an MRI and was scheduled with neurosurgery and was scheduled for surgery (presumably referring to his lumbar spine). (ECF No. 124-4 at 9; ECF No. 136-5 at 16-18.)

On July 16, 2017, Plaintiff sent Dr. Mar a kite asking if he was going to get the MRI for his neck and head, and complained he was in pain and had issues with balance and walking. (ECF No. 136-7 at 11.) He sent another kite about extreme pain in his neck and back to Dr. Mar on July 25, 2017. (ECF No. 136-7 at 35.)

There is a notation dated that Plaintiff was seen by Sierra Neurosurgery for status post L3-l5 laminectomies and bilateral foraminotomies with Dr. Leppla on August 7, 2017, and he was significantly improved since surgery. It was noted that Plaintiff had neck issues, and they hoped to have a cervical MRI at some point, and he was welcome to return after this. (ECF No. 124-11 at 2.)

Plaintiff sent a kite to Dr. Mar on October 15, 2017, stating that he was still having problems with his eyesight, and could barely see out of his right eye. He was advised that he was on the list to see the eye doctor and would be scheduled, but the list was very long. (ECF No. 136-5 at 45.)

There is a referral to Sierra Neurosurgery dated October 30, 2017, which was authorized, with a notation of an appointment date on January 19, 2018. (ECF No. 136-3 at 8.)

Plaintiff sent Dr. Mar another kite on November 27, 2017, stating that his daughter was a nurse and suggested he be tested for cervical spondylosis, and complained he could barely walk and felt off balance. (ECF No. 136-7 at 30.) He sent another kite to Dr. Mar that day stating that when he was seen previously, it was recommended that he see an outside consultant, and he was

still having severe pain in his neck, back and arms, as well as trouble walking. (ECF No. 136-7 at 31.)

While the handwriting is difficult to decipher, a provider noted on December 18, 2017, that Plaintiff had seen Dr. Leppla. The provider discussed that Plaintiff had neck pain, and an x-ray of the cervical spine in April of 2017 showed spondylosis. It was further noted that an MRI of the cervical spine was requested on April 3, 2017. (ECF No. 136-4 at 32.) That same day, Dr. Mar requested a referral to neurosurgery for neck pain, which was authorized, with a notation Plaintiff was scheduled for an appointment on March 12, 2018. (ECF No. 136-3 at 7.)

Plaintiff sent a kite on March 5, 2018, stating that Dr. Mar recommended Plaintiff see a specialist for his pain and he asked to be put on something else. In response, he was advised he was scheduled to see an outside provider on March 12, 2018, and they would follow up after those results were received. (ECF No. 136-7 at 4.)

Plaintiff was seen at Sierra Neurosurgery on March 14, 2018, for complaints of pain, arm and leg tingling and numbness, and worsening balance. The doctor said the symptoms were consistent with cervical stenosis and possible lumbar stenosis. MRIs of the cervical, lumbar and thoracic spine were requested. (ECF No. 136-3 at 13.) Orders for the MRIs of the spine were entered and authorized on March 19, 2018. (ECF No. 136-3 at 15.) X-rays of the cervical and lumbar spine were also ordered. (ECF No. 136-4 at 38.)

X-rays of the cervical spine on March 7, 2018, showed moderate to advanced osteoarthritis of the cervical spine, most conspicuous at C5-C6 and C6-C7. (ECF No. 136-5 at 13.)

Plaintiff had an MRI of the cervical spine on May 18, 2018. It showed, among other things, an enlarged empty sella, and a dedicated brain MRI was recommended to further evaluate for underlying pathology. (ECF No. 124-12 at 2-3; ECF No. 136-5 at 40-41.)

On May 31, 2018, Dr. Johns requested a consultation with Sierra Neurosurgery to follow up after the imaging studies. It was noted that there was an appointment for August 17, 2018, which was rescheduled to August 22, 2018. (ECF No. 124-6 at 2.)

Plaintiff saw Dr. Tolbert at Sierra Neurosurgery on August 22, 2018, for complaints of low back and neck pain and bilateral arm numbness and bilateral finger tingling, with neck pain radiating up over the head when he turns to the left, as well as electric shock into his hands. He was using a cane as he had difficulty walking. (ECF No. 124-7 at 3.) Dr. Tolbert felt that the disc degeneration in his cervical spine and stenosis was the most likely etiology for his neck and arm pain and balance issues, and felt decompression was warranted. He also discussed the cystic structure in the sella. Dr. Tolbert said that he would obtain the brain MRI and would refer Plaintiff to endocrinology for further evaluation. If it was a simple cyst, cervical surgery would be pursued. (ECF No. 124-7 at 3-5.)

The MRI of brain and brainstem was ordered for the sella mass evaluation on August 29, 2018. (ECF No. 136-4 at 25.)

There is a medical report on September 7, 2018, indicating that a "man-down" was called and Plaintiff reported that he stood up after count and became dizzy and fell backwards and his head and neck on the end of the bed. (ECF No. 136-5 at 19.)

Plaintiff had the brain MRI on September 25, 2018, which showed a large dumbbell shaped homogenous CSF isointense mass with a pencil thin enhancing capsule that expands the bony sell protruding upward into the suprasellar cistern. It abutted the overlying retro-orbital

segments of the optic nerves at the junction with the optic chiasm. (ECF No. 124-8 at 2-3; ECF No. 136-5 at 42-43.) The next day, Dr. Alley requested a follow up with Dr. Tolbert to review the brain MRI, which was authorized on October 9, 2018. (ECF No. 136-3 at 5.)

Plaintiff was seen on September 27, 2018. It was discussed that he had decreased peripheral vision, and a cyst-like lesion in the sella with possible hypopituitarism. He was referred to neurosurgery. (ECF No. 136-4 at 15.) That same day, Plaintiff saw the eye doctor; however, the notes are largely illegible. (ECF No. 136-4 at 7.)

On October 10, 2018, Dr. Alley completed a referral to endocrinology pursuant to Dr. Tolbert's request regarding hypopituitarism and diabetes insipidus, which was authorized. (ECF No. 136-3 at 6.)

A provider noted on November 19, 2018, that Plaintiff had seen the neurosurgeon on October 15 regarding the sellar mass and Plaintiff had consented to proceed with surgery. (ECF No. 136-4 at 16.)

Plaintiff saw Dr. John Sutton of Carson Tahoe Endocrinology on November 20, 2018, and assessed Plaintiff with a benign neoplasm of the pituitary gland, and commented Plaintiff would likely need surgery from Dr. Tolbert with ENT assistance. (ECF No. 124-9 at 4.) Dr. Sutton requested a report from the eye doctor and a visual field exam. (ECF No. 136-4 at 4.)

On November 20, 2018, Dr. Alley requested a follow up regarding the endocrinology consult to review the labs related to the cystic sellar mass, which was authorized on November 24, 2018. (ECF No. 136-5 at 80.)

On January 23, 2019, a referral was requested with Dr. Meier of Nevada ENT for a consultation prior to the scheduled surgery for excision of the pituitary adenoma with Dr. Tolbert, which was authorized. (ECF No. 136-3 at 17.)

There is a notation on March 20, 2019, that Plaintiff was awaiting surgery for the pituitary area cystic mass. (ECF No. 136-4 at 45.)

Plaintiff had surgery with Dr. Tolbert and Dr. Meier on April 18, 2019, for endoscopic transsphenoidal resection of the sellar cyst in the pituitary. (ECF No. 136-5 at 63.) Pathology results from the pituitary cyst came back with no malignancy identified. (ECF No. 136-5 at 82.)

Plaintiff was seen for follow up appointments with Dr. Tolbert, Dr. Sutton and Dr. Wolff. He also had several MRIs of the brain and pituitary region which demonstrated no residual or recurrent tumor. (ECF No. 124-10 at 2, 5; ECF No. 136-4 at 2, 3, 11-13; ECF No. 136-5 at 32, 48-49, 50, 77-78, 109.)

**2. Analysis**

Dr. Mar and Dr. Johns do not dispute that Plaintiff's pituitary mass was a serious medical need; therefore, the court will focus on whether Defendants were deliberately indifferent to that serious medical need.

The court finds that there is no evidence of deliberate indifference from the time Plaintiff had the cervical spine MRI on May 18, 2018, which showed the mass near his pituitary gland, through the time of his surgery to remove the mass and follow up care. While it is true that it was eleven months between the time he had the initial cervical MRI and the time he had surgery on April 18, 2019, there is no evidence of deliberate indifference with respect to any delay. Instead, Plaintiff had to have additional imaging and consultation with several other specialists before surgery. In addition, Defendants present unrefuted evidence that any delay was due to scheduling with outside providers.

There is no evidence that Defendants delayed his surgery to remove the pituitary tumor once they were aware of the existence of the mass. Nor is there any evidence, as Plaintiff alleges, that the surgery was delayed due to costs associated with the treatment.

The court will now address whether there is evidence of deliberate indifference up to the point Plaintiff received the cervical spine MRI identifying the pituitary mass.

Plaintiff sent kites complaining of neck pain and associated nerve pain and numbness and tingling in the first few months of 2017. Several of those kites were addressed to Dr. Johns. In April of 2017, Dr. Mar referred him to neurosurgery, and he had an x-ray of the cervical spine shortly thereafter, which revealed advanced spondylosis. Plaintiff was told that a request had been submitted for an MRI of the cervical spine, but Plaintiff did not have a cervical spine MRI.

When Plaintiff saw the neurosurgeon at the beginning of May 2017, he said they would be happy to see him for his cervical spine once he had a cervical MRI. At a June 2017 follow up with the neurosurgeon, it was noted that there was still no MRI of the cervical spine. Plaintiff sent a kite to Dr. Mar about problems with his neck and back, and Dr. Johns requested a referral to Sierra Neurosurgery in late June of 2017. After Plaintiff fell down in his cell, he sent a kite to Dr. Mar asking about a cervical MRI, and reported issues with balance and walking.  In August of 2017, after his lumbar spine surgery, Sierra Neurosurgery once again noted that Plaintiff could return once they had a cervical MRI. Plaintiff sent a kite about issues with his eyesight to Dr. Mar, and was told he was on a long list. He kited Dr. Mar again asking to be tested for cervical spondylosis, and complained about difficulty walking and with balance. It was acknowledged in December of 2017 that an MRI of the cervical spine had been requested in April of 2017. At that time, Dr Mar referred Plaintiff to neurosurgery, but Plaintiff still did not have his cervical spine MRI.

When Plaintiff was seen by the neurosurgeon three months later, in March of 2018, MRIs of the cervical, lumbar and thoracic spine were requested. At that point, the imaging was promptly ordered, and Plaintiff had the MRI of the cervical spine that revealed the pituitary mass two months later, on May 18, 2018.

Defendants provide no explanation why Plaintiff did not have a cervical spine MRI until May 18, 2018, when it was apparently requested internally within NDOC in April of 2017, and was initially requested by Sierra Neurosurgery in May of 2017, and referenced in Plaintiff's follow up appointments with Sierra Neurosurgery, and in Plaintiff's kites. Thus, Plaintiff has presented evidence to create a genuine dispute of material fact as to whether Defendants' delayed treatment relative to his pituitary tumor.

Where a delay in receiving medical treatment is alleged, an inmate must demonstrate that the delay led to further injury. Here, Plaintiff presents evidence that during the intervening time period, he continued to kite about pain, balance issues, difficulty walking and issues with his vision, and "man-downs" were called after he fell in his cell. This is sufficient evidence to create a genuine dispute of fact as to whether Plaintiff suffered injury as a result of this delay.

While Dr. Mar states that he has no knowledge of treating Plaintiff for his pituitary tumor, Plaintiff's medical records contain evidence of progress notes, orders, referrals and kites with respect to both Dr. Mar and Dr. Johns during this time period. Plaintiff has raised a genuine dispute of material fact as to whether Dr. Mar and/or Dr. Johns were deliberately indifferent to his serious medical need.

In sum, the court finds that Dr. Mar's and Dr. Johns' motion for summary judgment should be granted in part and denied in part with respect to the Eighth Amendment claim regarding his pituitary tumor. The motion should be granted with respect to the time period after

1  Plaintiff had his cervical MRI in May of 2018. The motion should be denied, however, insofar as

2  Plaintiff alleges a year-long delay in receiving the cervical MRI that led to the discovery of his

3  pituitary tumor.

4      Defendants' qualified immunity argument focuses on the administration of medication,

5  and therefore, appears to solely relate to the HCV claim. As such, the court will not address

6  qualified immunity in the context of the pituitary tumor claim.

7  **D. Plaintiff's Reference to Issues Not Proceeding in this Litigation**

8      Plaintiff's response references various issues which are not part of the claims proceeding

9  in this action and the court has not addressed, including the discontinuation of the medication

10 gabapentin/Neurontin within NDOC; his lumbar and thoracic spine issues; cervical spine issues

11 unrelated to his pituitary tumor; and issues related to his knees.

12                    **IV. RECOMMENDATION**

13     IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING**

14 **IN PART AND DENYING IN PART** Defendants' motion for summary judgment (ECF No.

15 122), as follows:

16     (1) The motion should be **GRANTED** as to the Eighth Amendment claim regarding

17 HCV;

18     (2) With respect to his pituitary tumor, the motion should be **GRANTED** insofar as

19 Plaintiff's Eighth Amendment claim is premised on conduct by defendants Dr. Mar and Dr.

20 Johns *after* Plaintiff's cervical MRI in May of 2018; however, the motion should be **DENIED**

21 insofar as Plaintiff alleges there was an Eighth Amendment violation by Dr. Mar and Dr. Johns

22 related to a delay in getting the cervical spine MRI that led to the diagnosis of the pituitary

23 tumor.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: April 21, 2023.

_____
Craig S. Denney
United States Magistrate Judge